UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| MAURIO RIVERS, | ) | C/A No. 4:13-1914-RMG-TER |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Report and Recommendation |
| | ) | |
| JOE BURNETTE; TIM KNIGHT, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**PROCEDURAL HISTORY**

Plaintiff, who is proceeding pro se in this action, alleges causes of action under 42 U.S.C. § 1983 for excessive force during his arrest. Plaintiff filed this action on July 15, 2013. Presently before the Court is Defendants' Motion for Summary Judgment (Doc. #33).[1] Because Plaintiff is proceeding pro se, he was advised pursuant to Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), that a failure to respond to Defendants' Motion could result in a recommendation that the motion be granted. Plaintiff filed a Response on January 10, 2014. (Doc. #42 ). Plaintiff also submitted additional documents on December 20, 2013. (Doc. #40).

**STANDARD OF REVIEW**

The moving party bears the burden of showing that summary judgment is proper. Summary judgment is proper if there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

---

[1] All pretrial proceedings in this case were referred to the undersigned pursuant to the provisions of 28 U.S.C. § 636(b)(1)(A) and (B) and Local Rule 73.02(B)(2)(e), DSC. Because the present Motion is dispositive, this Report and Recommendation is entered for review by the district judge.

Summary judgment is proper if the non-moving party fails to establish an essential element of any cause of action upon which the non-moving party has the burden of proof. Celotex, 477 U.S. 317. Once the moving party has brought into question whether there is a genuine dispute for trial on a material element of the non-moving party's claims, the non-moving party bears the burden of coming forward with specific facts which show a genuine dispute for trial. Fed.R.Civ.P. 56(e); Matsushita Electrical Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574 (1986). The non-moving party must come forward with enough evidence, beyond a mere scintilla, upon which the fact finder could reasonably find for it. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). The facts and inferences to be drawn therefrom must be viewed in the light most favorable to the non-moving party. Shealy v. Winston, 929 F.2d 1009, 1011 (4th Cir. 1991). However, the non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment. Barber v. Hosp. Corp. of Am., 977 F.2d 874-75 (4th Cir. 1992). The evidence relied on must meet "the substantive evidentiary standard of proof that would apply at a trial on the merits." Mitchell v. Data General Corp., 12 F.3d 1310, 1316 (4th Cir. 1993).

To show that a genuine dispute of material fact exists, a party may not rest upon the mere allegations or denials of his pleadings. See Celotex, 477 U.S. at 324 (Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves). Rather, the party must present evidence supporting his or her position through "depositions, answers to interrogatories, and admissions on file, together with ... affidavits, if any." Id. at 322; see also Cray Communications, Inc. v. Novatel Computer Systems, Inc., 33 F.3d 390 (4th Cir. 1994); Orsi v. Kickwood, 999 F.2d 86 (4th Cir. 1993); Local Rules 7.04, 7.05, D.S.C.

**FACTS**

Plaintiff's version

In his complaint, Plaintiff alleges the following, quoted verbatim:

> Plaintiff was assaulted by members of the Dorchester County Sheriff's Department on July 12, 2011 during an arrest. Plaintiff did not resist arrest, was never charged, and was actually handcuffed behind his back while he was beaten unconscious with the butt of a shotgun, with fist, kicked, spit on, bit by K-9 dog's all over his body, and repeatedly told he was going to die. One of the officers broke his hand while beating Plaintiff. Plaintiff was transported by ambulance to the hospital where he received treatment for various injuries. When Plaintiff regained consciousness three days afterward, he had two black eyes, dog bites all over his body, and as a result had to have an operation on his testicles. The officers responsible for causing these injuries were the Defendants: Joe Burnett, Lt.; and Tim Knight. As a result Plaintiff still suffers daily from physical, mental and emotional anguish. Plaintiff still has to receive medical treatment for the pains and suffers from sleep deprivation because of the nightmares he has. Plus, Plaintiff may never have the ability to reproduce ever again. Plaintiff will be suing the defendants in their individual capacity.

(Complaint).

Plaintiff seeks monetary damages for his hospital bills, punitive damages for violation of his due process right and for denying him equal protection of law, and pain and suffering.

Defendants' version

Defendants submitted several affidavits in support of the motion for summary judgment. The affidavits of Lieutenant Joseph Burnette, Tim Knight, former Dorchester County Sheriff's Sergeant,[2] and Corporal Justin Michael Eugene Eaches correspond to the events pertaining to the chase of the

---

[2] Knight attests that he was employed with the Dorchester County Sheriff's Office from October 2007, until September 2013, when he left to take a job position with the Berkeley County School District as the Safety and Security Director. Knight asserts he resigned from the Sheriff's office to pursue a more favorable job opportunity and remains on amicable terms with his previous employer.

vehicle, the forced stop, and the chase of the driver of the vehicle. (See documents #33-3, #33-4, and #33-5). Their version of the facts are set forth below.

On July 12, 2011, while patrolling interstate 95, Eaches activated his blue light to initiate a traffic stop on a black 2006 Acura for improper lane usage and changing lanes unlawfully. (Eaches affidavit, doc. #3-5). The driver of that vehicle turned out to be Plaintiff Rivers, and his passenger was Shelley Bronson. (Id.). Although the car initially moved to the emergency lane as if to stop, it proceeded back onto the interstate and significantly accelerated its speed. (Id.). Eaches activated his sirens and blue lights and gave chase. (Id.). Eaches advised dispatch of the incident and vehicle information. (Id.). At that time, Lt. Burnette joined in the chase to provide backup for what was turning into a high risk traffic stop. (Id.). Shortly after the chase started, Eaches alerted Lt. Burnette that his patrol car was not equipped to keep up with the suspect's car with speeds in excess of 100 mph and that Burnette's car should take the lead as primary vehicle on the pursuit. (Id.). Eaches was driving an older Crown Victoria and Lt. Burnette was driving a Dodge Magnum. (Id.). However, Eaches assumed his role as secondary vehicle. (Id.). The suspect's vehicle attempted to elude the officers and a high-speed chase off I-95 ensued onto S.C. Highway 61 toward Bamberg, which is a much narrower road and created a very dangerous situation for both deputies pursuing and the general public. (Id.). At one point the suspect's vehicle passed a motorist on a curve at a high rate of speed in an attempt to escape pursuit. (Id.). During the chase, the passenger in the suspect's car fired gunshots at the pursuing deputies. After his patrol car was shot at by the fleeing suspects, Lt. Burnette performed a forced stop method to force the subject's vehicle to stop. (Id.). Both suspects ran from the vehicle on foot into a nearby wooded area and ran in opposite directions. (Id.). Deputies were concerned the suspects were both armed and dangerous because they had shown complete disregard for the safety of the officers and the general public. (Id.). Cpl. Deputy Knight arrived on the scene shortly afer the suspect's vehicle

4

was stopped and assisted Lt. Burnette in pursuing Plaintiff into the woods. While Lt. Burnette still had the suspect in sight, he released his K-9 "Fiest" to apprehend Rivers. Eaches stayed at the scene to safeguard the deputies' vehicles that could not be left unattended and to secure the suspect's vehicle. Lt. Burnette and Cpl. Deputy Knight returned shortly with suspect Rivers handcuffed and in custody. Eaches advised Plaintiff of his Miranda rights and informed him that EMS was on the way to treat any injuries he might have sustained while fleeing and resisting arrest. The K-9 also successfully tracked the passenger suspect who was taken into custody and later identified as Bronson Sheeley. Both suspects were transported to Colleton County Hospital for any needed medical treatment. Both occupants in the car were later tried on charges of attempted murder and possession of a weapon during a violent crime and found guilty. Plaintiff is presently serving 30 years on the charges.

Lt. Burnette attests that on July 12, 2011, while he was providing back-up support to Cpl. Knight on a traffic stop on Interstate 95 South, he was radioed by Cpl. Eaches that a vehicle he was trying to stop behind Burnett's location was failing to stop for the blue lights. (Affidavit of Burnette, doc. # 33-3). Burnette left that traffic stop with Cpl. Knight to assist Cpl. Eaches with what was perceived as a high risk traffic stop. (Id.). Burnette took the lead and became the primary vehicle on the pursuit because he was driving a Dodge Magnum that was better equipped to keep up with the fleeing suspect's car which was speeding at approximately 100 mph. (Id.). As the supervising deputy involved and in accordance with the Standard Operational Procedure, Dorchester County Sheriff's Office Policy and Procedures, Burnette considered the high degree of risk involved in the pursuit, the danger posed to the public if the suspects remained at large, and the actions of the suspects including additional violations. (Id.). At Exit 68, the suspects made a speeding right turn onto Highway 61 towards Bamburg and proceeded on Highway 61 with speeds about 90 mph. (Id.). Burnette avers that he saw a passenger positioning around inside the vehicle as if to retrieve something. (Id.). The

passenger, later identified as Bronson Shelly, came up through the vehicle's sunroof while standing on the passenger seat and began shooting at Burnette and the other pursuing officers. (Id.). Burnette zigzagged and veered his car to avoid being hit. (Id.). Shelley fired 5 or 6 shots. (Id.). The standard Continuum of Force doctrine authorizes the use of mounting force to counter force during an encounter or arrest. (Id.). Due to the circumstances and the shots being fired, Burnette engaged in a forced stop procedure. (Id.). Burnette first used the front passenger side of the patrol vehicle and contacted the rear driver's side of the suspect vehicle to forcible stop it from fleeing in accordance with the Dorchester County Sheriff's Office Policy. (Id.). After the impact, the suspect's vehicle spun around, left the roadway, and struck a tree before rolling over. (Id.). Burnette stopped and was exiting his car when he heard a splatter on his vehicle windshield and saw the front windshield near the dash shattered. (Id.). Burnette exited from his car and approached the suspect's car with his pistol drawn. (Id.). Burnette saw two black males running from the suspect car into the woods. (Id.). Burnette gave K-9 Fiest a command to pursue them into the woods. (Id.). Burnette and Corporal Knight ran after the suspects behind K-9 Fiest. (Id.). When the suspects got into a more densely wooded area, he lost sight of them, but once he got closer to K-9 Fiest, Burnette could see that Fiest had apprehended suspect Rivers and was holding him with his teeth on his upper thigh. (Id.). Suspect Rivers was hitting K-9 Fiest with his fists. (Id.). Plaintiff ignored Rivers' commands to stop fighting K-9 Fiest and to submit. Burnette attests that he hit Plaintiff on his upper torso to stop him from hitting K-9 dog, Fiest. (Id.). At that point Corporal Knight and Burnette tried to control Plaintiff Rivers and arrest him, but he continued to resist and to hit both officers. (Id.). When the officers wrestled Plaintiff to the ground, Plaintiff rolled onto his stomach and stuck his hands beneath him under his waist. (Id.). Burnette thought Plaintiff might be attempting to get a weapon, so he hit his arms while ordering him to put his hands behind his back. (Id.). After the officers were able to get Plaintiff's hands behind his back and

handcuffed, Burnette got his K-9 Fiest to disengage, escorted Plaintiff back to the road, and called for EMS in compliance with the Dorchester County Sheriff's Office Policy and Procedure 11.06: Canine operations. (Id.). Burnette avers that they were delayed by Plaintiff's actions, but as more personnel arrived on the scene including Major Garrison and Captain Moore, Burnette assisted in creating a perimeter in an attempt to keep th other suspect, Shelley, contained until a track could be traced by Deputy Rollins and his K-9 dog Blitz. (Id.). A bullet had hit the front driver's side bumper, and another shot had shattered the driver's side windshield. (Id.). Both Rivers and Shelley were later tried on the charges of attempted murder and possession of a weapon during a violent crime and found guilty. (Id.). Plaintiff Rivers is now serving his 30-year sentence. Burnette attests that he believes the use of force by the deputies, and all of the law enforcement officers on the scene, was reasonable and justifiable because the two suspects were fleeing felons, and armed with a deadly weapon which they used against law enforcement. (Id.). As law enforcement, Burnette asserts that they would have been justified in meeting deadly force with deadly force, but rather utilized K-9 officers and hand combat to arrest the suspects. (Id.). The use of force was deemed justifiable by the sheriff's office.[3] (Id.).

In his response in opposition to summary judgment, Plaintiff asserts that it was the passenger firing shots at the officer, not him so that he was wrongfully convicted. (Doc. #42). Plaintiff states that the evidence against him only showed that he was in the car with the co-defendant traveling at a high rate of speed and did not stop for the lights and sirens. (Id.). Plaintiff states that he does not deny that he hit the K-9 but denies he ever hit the defendants. (Id.). Plaintiff avers that he only struck the K-9 because he would not stop biting his testicles and groin area. (Id.). Plaintiff asserts that he was never charged with resisting arrest and was found not guilty of possession of a weapon during the commission of a violent crime. (Id.). Plaintiff argues that his allegations that the Defendants assaulted

---

[3] The affidavit of Paul Timothy Knight mirrors Burnette's affidavit. See doc. # 33-4.

him are supported by the photographs[4] and medical records from the ambulance and hospital. Plaintiff asserts that the Defendants allege that he fled the vehicle after the wreck but was not conscious when the ambulance arrived. (Id.). Plaintiff argues that the loss of consciousness was not caused by the accident but by the force used by the Defendants in attempting to arrest him. (Id.).

## EXCESSIVE FORCE

Protection against force during arrest is provided by the Fourth Amendment. Graham v. Connor, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). All claims of use of excessive force during an investigatory stop or arrest or other seizures are governed by the Fourth Amendment's "objective reasonableness" standard. Id. The test for excessive force in the arrest context requires "balancing the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the government's interests alleged to justify the intrusion." Tennessee v. Garner, 471 U.S. 1, 8, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985). The standard for measuring reasonableness of arrest is wholly objective. The objective reasonableness test requires careful attention to the circumstances of a particular case, including the severity of the crime, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight. Graham, 490 U.S. at 396; Foote v. Dunagan, 33 F.3d 445 (4th Cir.1994). The focus is on reasonableness at the moment, recognizing that officers are often forced to make split-second judgments in circumstances that are tense, uncertain, and rapidly evolving. Graham, 490 U.S. at 396.

The facts in the present case are in dispute with regard to whether Burnette and Knight used excessive force by striking and hitting the Plaintiff after he was down on the ground and handcuffed.

---

[4] There are no photographs in the record.

When viewed in the light most favorable to Plaintiff, the facts reveal that Plaintiff was apprehended by the K-9 which he was hitting when the officers approached. Burnette admits that he hit Plaintiff in the upper torso area to make him stop hitting the K-9 with his fists and hit Plaintiff's arms when he was resisting arrest and putting his arms under his waist as if to retrieve a weapon. Defendants assert that EMS was called and Plaintiff was taken to the hospital. They do not submit any medical records to show the type and extent of any injuries or note that Plaintiff was unconscious. In fact, Eaches stated in his affidavit that when Lt. Burnette and Cpl. Deputy Knight returned with Rivers handcuffed and in custody, he "advised Plaintiff Rivers of his Miranda rights and informed him that EMS was on the way to treat any injuries he might have sustained while fleeing and resisting arrest." (Doc. # 33-5, p. 2). Defendants never indicate that Plaintiff was unconscious or at what point he became unconscious as alleged by Plaintiff. However, Plaintiff submitted the narrative from the ambulance record revealing that when they arrived, Plaintiff was unresponsive on the side of the road. (Doc. #40, p.2). Plaintiff had dog bites wounds to his inner left thigh and right thigh and a dog bite and laceration to the scrotum with a primary symptom of bleeding. (Id.). The ambulance record revealed Plaintiff sustained dog bites to the left and right thigh, scrotum, and right forearm and tenderness to the abdomen. (Doc. #40, p.6). Based upon these facts, a genuine dispute of material fact exists. As set forth, Plaintiff's version of the facts indicate Defendants struck Plaintiff multiple times while on the ground and handcuffed. Although the affidavits submitted by the Defendants universally indicate that Plaintiff was only struck by Burnette in the upper torso to make him stop hitting the K-9 and on his arms when they were attempting to handcuff him and were afraid he was reaching for a gun, the undersigned must, pursuant to Rule 56, view the evidence in the light most favorable to the non-moving party.[5]  While the evidence

---

[5]"It is not [this court's] job to weigh the evidence." Gary v. Spillman, 925 F.2d 90, 95 (4th Cir.1991). This court "must view the facts, and all reasonable inferences that may be drawn from those facts,

9

is substantially in favor of the Defendants, the affidavits submitted by Defendants and Plaintiff's verified complaint and response to summary judgment present an issue of material fact. Therefore, summary judgment is not appropriate on Plaintiff's excessive force claim against Defendants.[6]

## CONCLUSION

For the reasons discussed above, it is recommended that Defendants' Motion for Summary Judgment (doc. # 33) be denied.

                                  Respectfully submitted,

                                  s/Thomas E. Rogers, III
                                  Thomas E. Rogers, III
                                  United States Magistrate Judge

March 20, 2014
Florence, South Carolina

**The parties are directed to the important information on the following page.**

---

in the light most favorable to the non-moving party." Meyers v. Baltimore Cnty., Md., —— F.3d ——, ——, 2013 WL 388125 at *4 (4th Cir. Feb.1, 2013). Accordingly, the facts, in the light most favorable to the non-moving party, show that a genuine issue of material fact exists as to issue of whether Defendants used excessive force during Plaintiff's arrest on July 12, 2011, in violation of Plaintiff's Fourteenth Amendment rights. See Davis v. Zahradnick, 600 F.2d 458, 460 (4th Cir.1979) (holding that summary judgment is not appropriate if the resolution of material issues depends upon credibility determinations).

[6] Defendants raise the affirmative defense of qualified immunity. (ECF No. 12–1 at 17–19). The doctrine of qualified immunity shields government officials performing discretionary functions from liability for civil damages where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). The steps in determining whether officials are entitled to qualified immunity are: (1) an inquiry into whether the plaintiff has alleged a deprivation of a constitutional right and (2) whether that right was clearly established at the time of the alleged violation. Rogers v. Pendleton, 249 F.3d 279, 286 (4th Cir.2001). Under Plaintiff's version of the facts, Defendants actions are not shielded by qualified immunity because a reasonable officer in that position would have understood that the degree of force exerted violated Plaintiff's rights.