UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Maurio Rivers, #232669 | ) | Civil Action No. 4:13-01914-BHH |
| Plaintiff, | ) | |
| vs. | ) | **OPINION AND ORDER** |
| Joe Burnette; Tim Knight, | ) | |
| Defendants. | ) | |

The plaintiff, Maurio Rivers ("Rivers"), proceeding *pro se*, brought this Section 1983 action alleging that Lieutenant Joe Burnette ("Lt. Burnette") and Corporal Tim Knight ("Cpl. Knight") ("the defendants"), who at the relevant time were both officers with the Dorchester County Sheriff's Department, used excessive force in arresting him following a high-speed chase. The officers are sued in their individual capacity. This matter is before the Court for review of the Report and Recommendation ("the Report") of United States Magistrate Judge Thomas E. Rogers, made in accordance with 28 U.S.C. § 636(b)(1)(A) and (B) and Local Rule 73.02 for the District of South Carolina.

## BACKGROUND

There does not appear to be any substantive dispute about the facts leading up to the plaintiff's arrest. On July 12, 2011, Corporal Justin Michael Eugene Eaches ("Cpl. Eaches") attempted to stop a black Acura for improper lane usage. While the vehicle initially pulled over, it then accelerated back onto the road and fled. A high speed chase followed on I-95 and Highway 61 toward Bamberg, with the fleeing vehicle reaching up to 100 mph. Cpl. Eaches' vehicle had a difficult time keeping up with the fleeing suspects, so Lt. Burnette, who joined the pursuit, took over as the lead vehicle in

1

pursuit. As the suspects sped down Highway 61, the passenger in the vehicle, who was later identified as Bronson Shelley ("Shelley"), fired a handgun at the pursuing officers. Lt. Burnette then forced the fleeing vehicle off the road where it crashed. Both occupants of the vehicle fled. Lt. Burnette, his police K9, "Feist", and Cpl. Knight pursued Rivers into a wooded area off of Highway 61. Rivers was apprehended by K9 Feist and arrested by Lt. Burnette and Cpl. Knight. Both Rivers and Shelley, who was also subsequently arrested, were convicted of attempted murder in connection with the incident. Rivers is serving a 30-year sentence for that conviction.

The parties' accounts of Rivers' arrest are detailed in the Magistrate Judge's thorough Report. In short, Rivers claims that he did not resist arrest and that, after he was handcuffed behind his back, he was beaten unconscious with the butt of a shotgun, punched, kicked, spit on by the officers, and bitten by K9 Feist all over his body. The defendants allege that when they caught up to Rivers he was punching K9 Feist who had latched on to his upper thigh. After instructing Rivers to stop resisting K9 Feist, the defendants knocked him to the ground. Burnette admits that he struck the plaintiff on his upper torso to get him to stop hitting K9 Feist. The plaintiff then struck both officers, struggled with them, rolled onto his stomach, and reached into his waistband. The officers hit the plaintiff's arms and torso ordering him to put his hands behind his back. When the plaintiff complied, the officers handcuffed him and ordered K9 Feist to disengage. They then led him out of the woods and allowed him to lay down by the side of the road. Once the scene was secure, medical personnel arrived to treat the plaintiff's injuries and transported him by ambulance to a hospital.

The defendants filed an initial motion for summary judgment (ECF No. 33) on December 2, 2013. On March 20, 2014, Magistrate Judge Rogers issued a Report and Recommendation (ECF No. 44) recommending that the motion for summary judgment be denied. The defendants objected to the Report and Recommendation (ECF No. 47) and filed a motion to supplement the record (ECF No. 48) to add evidence in the form of video footage from the dashcam in Lt. Burnette's vehicle. The Honorable Richard M. Gergel issued a text order (ECF No. 61) granting the defendants' motion to supplement the record, declining to adopt the Report and Recommendation, denying the motion for summary judgment as moot, and returning the matter to Magistrate Judge Rogers for further proceedings, including a renewed motion for summary judgment and consideration of the video evidence.

The defendants filed a renewed motion for summary judgment (ECF No. 70) on June 9, 2014. As set forth in the following excerpt from the defendants' renewed motion for summary judgment, the defendants allege that the video evidence submitted to supplement the record demonstrates that the plaintiff's claims are false and entitles them to summary judgment:

> There is an actual video of the entire incident, including the car chase, Plaintiff fleeing from the vehicle, voice records of Defendants telling Plaintiff to put his hands behind his back, and then Plaintiff handcuffed walking out of the woods on his own volition where he sits and then lies down until EMS arrives. He is clearly not "beaten unconscious with the butt of a shotgun" as he states in his verified Complaint.

(ECF No. 70 at 10.)

The plaintiff submitted a response in opposition, which was filed a day after the deadline to respond. The plaintiff had also previously submitted a CD (ECF No. 65) containing pictures of himself and Shelley, which showed both of them with injuries at

3

the hospital following their arrests. On June 30, 2014, the case was reassigned to the undersigned. After considering the motion and reviewing the evidence, including the additional video footage, Magistrate Judge Rogers issued a second Report and Recommendation (ECF No. 81) recommending, once again, that the motion for summary judgment be denied.

The Magistrate Judge bases his sustained recommendation that summary judgment be denied on the existence of genuine issues of material fact regarding what transpired while the defendants and the plaintiff were in the woods, out of the view of Lt. Burnette's dashcam. As the Report explains:

> The video does not show what transpired in the woods. The parties agree that Plaintiff was apprehended by the K-9 which he was hitting when the officers approached. Burnette admits that he hit Plaintiff with his fists in the upper torso area to make him stop hitting the K-9 and hit Plaintiff's arms when, he asserts, Plaintiff resisted arrest and put his arms under his waist as if to retrieve a weapon. Clearly, the Plaintiff's version of events is materially different from that of the Defendants. By way of the officer's microphone, the officers can be heard saying "get your hands behind your back" and "get your other hand behind your back" and what is assumed to be the dog to "let loose." However, the video reveals a period of time between these commands and when Plaintiff was escorted out of the woods which creates a genuine dispute of material facts.
>
> . . . .
>
> Based on the photographs, Plaintiff had what appear[] to be wounds to his thighs, lacerations to the scrotum with bleeding, and lacerations to his arms, head, and face. Plaintiff also appears to be unconscious in the photographs. Defendants contend that the Plaintiff's version of events is not credible because contrary to his statements, the video shows he was not unconscious when he walked out of the woods. However, in the light most favorable to the Plaintiff, it is not clear from the video whether or not Plaintiff remained conscious after he was escorted out of the woods and laid on the ground.

(ECF No. 81 at 11-12.)

The defendants filed an objection to the Report (ECF No. 83) on January 5, 2015. In their objection, the defendants argue that the plaintiff's response to the renewed motion for summary judgment was untimely and should be disregarded, and the motion should be considered unopposed. (ECF No. 83 at 4-5.) The defendants also challenge the Magistrate Judge's conclusion that a period of time between when the officers told the plaintiff to put his arms behind his back and when they emerged from the woods creates a genuine issue of material fact:

> Defendants are perplexed and in a quandary as to how if "the video reveals a period of time between these commands and when Plaintiff was escorted out of the woods" that such "creates a genuine dispute of material facts." It appears that other factors, entirely unrelated to the issues in this case, may explain the purported delay, for instance, as to how deep in the woods the parties were prior to exiting.

(ECF No. 83 at 7). The plaintiff filed a "reply" to the objection (which was also tardy) in which he alleges that his failure to timely respond to the renewed motion for summary judgment was caused by his inability to access the prison law library, through no fault of his own.

## **STANDARD OF REVIEW**

The Magistrate Judge makes only a recommendation to the court. The recommendation has no presumptive weight. The responsibility to make a final determination remains with the court. *Mathews v. Weber*, 423 U.S. 261, 270–71, 96 S.Ct. 549, 46 L.Ed.2d 483 (1976). The court is charged with making a *de novo* determination of those portions of the Report and Recommendation (the "Report") to which specific objection is made, and the court may accept, reject, or modify, in whole or in part, the recommendation of the Magistrate Judge, or recommit the matter with instructions. 28 U.S.C. § 636(b)(1). However, the court need not conduct a *de novo*

5

review when a party makes only "general and conclusory objections that do not direct the court to a specific error in the magistrate's proposed findings and recommendations." *Orpiano v. Johnson*, 687 F.2d 44, 47 (4th Cir. 1982).  In the absence of a timely filed, specific objection, the Magistrate Judge's conclusions are reviewed only for clear error.  *See Diamond v. Colonial Life & Accident Ins. Co.*, 416 F.3d 310, 315 (4th Cir. 2005).

## Summary Judgment

A party asserting that a fact is genuinely disputed must support the assertion by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56 (c)(1)(A).  A litigant "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir.1985).  "Mere unsupported speculation . . . is not enough to defeat a summary judgment motion." *Ennis v. National Ass'n of Bus. & Educ. Radio, Inc.,* 53 F.3d 55, 62 (4th Cir. 1995).

"[W]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, disposition by summary judgment is appropriate." *Teamsters Joint Council No. 83 v. Centra, Inc.*, 947 F.2d 115, 119 (4th Cir.1996).  "Summary judgment is proper only when it is clear that there is no dispute concerning either the facts of the controversy or the inferences to be drawn from those facts." *Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir.1987).  The court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury

or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

## DISCUSSION

Because the defendants submitted specific objections to the Magistrate Judge's Report, this Court has conducted a thorough, *de novo* review of the record, including the video evidence that the defendants maintain entitles them to summary judgment. What follows is a detailed description of what the Court saw and heard on the footage beginning around the time that Shelley fired on Lt. Burnette and continuing through the time at which the plaintiff was loaded into an ambulance. The times -- given in hours, minutes, and seconds -- correspond to the clock on Lt. Burnette's dashcam.

The video begins with Lt. Burnette pursuing a black Acura. Around 19:08:47 a subject later determined to be Shelley can be seen emerging from the top of the vehicle Rivers was driving. Moments later, Officer Burnette reports, "shots fired." Officer Burnette then appears to accelerate and strike the Acura with his police cruiser on the right side toward the rear of the vehicle. The Acura spins around, veers off the road to the left, and strikes a small tree before overturning at 19:09:06. Although it cannot be seen on the video, Rivers and Shelley apparently exited the car almost immediately after it flipped over and fired a shot at Officer Burnette, which struck the windshield of his vehicle. Officer Burnette appears on the video at 19:09:14 with his handgun drawn shouting for the occupants of the vehicle to put their hands up. K9 Feist can be seen unleashed at his side. Lt. Burnette begins to pursue the suspects, running away from the roadway and toward a wooded area that is visible behind the overturned vehicle,

7

and he instructs K9 Feist to chase the suspects at 19:09 19. Other officers can be seen arriving moments later, including Cpl. Knight, who joins in the pursuit.

By 19:09:30 Lt. Burnette, Cpl. Knight, and a third officer are no longer visible on the video, having disappeared into the woods to pursue Rivers and Shelley. Around 19:09:45, one of the officers can be heard saying "get your hands up . . . get them up. Get your hands up or I'll shoot you right now, boy. . . . Get on the fucking ground." K9 Feist can be heard barking in the background. At 19:10:04 one of the officers says, "get your hands behind your back." There are rustling sounds and some muffled statements that are indiscernible. At 19:10:45, one of the officers can be heard saying "get your other hand behind your back" and repeating the instruction at 19:10:52. At 19:11:00 one of the officers radios out, "we've still got one at large." At around 19:11:03, a distressed-sounding voice can be heard saying something along the lines of, "get the dog off." One of the officers can then be heard saying, "good boy, "loose, loose" and repeating the instruction as a dog barks and growls.

Around 19:11:43, one of the officers can be heard saying "get up, get up" followed by "loose, loose, loose" (19:11:47 – 49) and "get up, standup" (19:11:55 – 59). At 19:12:20, an officer can be heard saying over the radio, "We've got one in custody." There are additional indiscernible sounds, some loud shouting and the dog can be heard continuing to bark. Around 19:14:10, officers come across the radio to provide instructions regarding redirecting traffic. On the video, additional officers can be seen looking inside the overturned vehicle. There are also some further communications over the radio about the pursuit and the fact that the suspects fired at the officers. At 19:14:57, two officers can be seen emerging from the woods with a handcuffed African-

American man wearing a white t-shirt, who was later identified as Rivers.  It does not appear from the video that any of the officers escorting Rivers were carrying a shotgun as they emerged from the woods, but the Court cannot completely rule out the possibility because the video offers a limited vantage point.  At no point does the footage show the officers beating Rivers or allowing a dog to bite him.

As Rivers is led to the side of the road he appears to sit down or fall over onto the ground.  At 19:15:42, Rivers appears to roll over onto his belly as two officers, one kneeling beside him and one standing, appear to try to speak to him.  While this is occurring, an officer who appears to be Lt. Burnette returns a K9 to an area behind his dash cam.  Lt. Burnette then approaches Rivers at 19:16:08 and says, "you know you are looking at attempted murder now, right, buddy?  You understand that?"  Rivers presumably offers some response because Lt. Burnette then says, "I don't care, attempted murder, son."  The officers can then be heard agreeing that Rivers was the driver of the vehicle.

At 19:17:47 Lt. Burnette again approaches Rivers and picks up one of his legs showing another officer who is with him and saying, "I don't know where . . ., he may or may not be bit up . . . right there in the leg, and maybe somewhere up in, in the groin area."  Around 19:19:10, an officer, presumably Lt. Burnette, can be heard talking over the radio saying, "shots fired . . . at me . . . uh, they were [indiscernible] off, rolled over, got out and ran, and I apprehended them with the dog.  One suffered a concussion, one at large."  Rivers continues to lie on the ground near the road in handcuffs.  Around 19:28:20, someone who appears to be a medical technician arrives and begins to tend

9

to Rivers. An ambulance can be seen arriving at 19:33:23, and Rivers was subsequently transported to the hospital.

As noted, Rivers submitted a disk containing photographs of himself and Shelley from the hospital where they were taken following their arrests. In these photos, Rivers has several scrapes and bruises on his face, nasal packing in his right nostril, and appears to be unconscious. He has numerous bite marks or scratches on his right arm and left thigh, scratches on his chest, and a fairly large hole in his scrotum through which one of his testicles can be seen.

Having reviewed the video evidence and the rest of the record, the Court agrees with the Magistrate Judge that summary judgment is inappropriate at this stage. As an initial matter, the Court will not construe the defendants' renewed motion to be "unopposed" because the plaintiff filed his response a day late. However, even if the Court were to exclude the plaintiff's response, there is still sufficient evidence in the record in the form of the allegations of the plaintiff's verified complaint and the hospital photos (which were submitted prior to the defendants filing their renewed motion for summary judgment) to allow the plaintiff to survive a motion for summary judgment.

While the defendants argue that they would have been justified in meeting deadly force with deadly force, they have not argued that they are entitled to hit a suspect or allow a dog to bite him after he has been successfully handcuffed and restrained. Nor have they argued that an officer who did either of these things would be entitled to qualified immunity and judgment as a matter of law. Rather, they have asserted that, *as factual matter*, they did not beat the plaintiff or allow K9 Feist to bite him after he was handcuffed and restrained. The defendants have directed the Court to authority

indicating that a court may grant summary judgment where evidence in the record, such as video evidence, so clearly demonstrates that a party's allegations are false that no reasonable jury could believe them. *See Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

That, however, is not the case here. Over five minutes elapsed between the time at which the defendants disappeared from Lt. Burnette's dashcam to pursue the suspects into the woods (19:09:30) and the time they reemerged with Rivers in handcuffs (19:14:57). From what the Court understands, this is the time period during which the plaintiff alleges that he was beaten and mauled while handcuffed. The fact that the plaintiff can be seen walking from the woods with the defendants does not foreclose the possibility that he was beaten and was unconscious, albeit for a brief time. Indeed, the plaintiff quickly slumped to the ground after he and the officers reached the side of the road, and pictures of him taken at hospital appear to show him unconscious. Of course, these injuries could have been sustained in the car accident or in a struggle with the defendants and K9 Feist prior to the plaintiff being handcuffed. The Court simply cannot tell from the evidence in the record. Therefore, both the source of the plaintiff's injuries and the sequence of events that transpired in the woods are factual matters that can only be resolved by a jury.

Furthermore, without video evidence, the Court cannot even determine with sufficient certainty at what point the plaintiff was handcuffed. The audio clips of the officers ordering him to put his hands behind his back (19:10:04 and 19:10:45) and

11

instructing the dog to release him (19:11:03) suggest that there may have been a brief struggle that consumed some of the time the parties were in the woods. The defendants argue that their "delay" in removing the plaintiff from the woods may be explained by other factors, such as how deeply the parties had ventured into the woods. This is certainly an argument that can be presented to a jury, but it is, by no means, dispositive, especially since the audio suggests that the officers were struggling with the plaintiff less than a minute after disappearing into the woods and because what has been alleged, that the officers beat the plaintiff and allowed a dog to bite him while he was handcuffed, could be accomplished in a very short period of time.

It is readily apparent from the dashcam footage that the plaintiff and his passenger posed a grave danger to the defendants, their colleagues, and the general public. There is no question that the officers were justified in forcing the fleeing vehicle from the road after they were fired upon and in using force, including their K9s, to apprehend and restrain Rivers and Shelley. Indeed, the plaintiff and his passenger are very fortunate that no one was killed. At the same time, it is well established that a suspect's conduct, no matter how vile or reckless, is not a justification for officers to beat him or allow a dog to bite him once he is effectively restrained, and the defendants have not argued otherwise. While the dashcam footage does not show the officers beating the suspect, allowing a dog to bite him, or in any other way abusing him, there is approximately five minutes of footage where both the defendants and the plaintiff are out of the view of the dashcam. It is during these five minutes that K9 Feist and the defendants apprehended Rivers. It is also during these five minutes that Rivers alleges that he was abused.

Although the sequence of events captured in the video and audio can certainly be argued to support the defendants' position, they do not disprove the plaintiff's claims or foreclose the possibility that a reasonable jury could believe the plaintiff's account. The situation might be different had the officers been wearing body cameras that showed their struggle with Rivers, and law enforcement departments across the country have recently been urged to use this technology to protect their officers and the community. The plaintiff's account of what happened in the moments before and after he was restrained clearly conflicts with the testimony of the defendants, and, in the absence of conclusive evidence one way or the other, it falls to a jury to assess the credibility of the parties and render a verdict.

## **CONCLUSION**

For the reasons set forth above, the defendants' objections are overruled, and the Magistrate Judge's Report is adopted and incorporated herein by reference. The defendants' renewed motion for summary judgment (ECF No. 70) is denied.

**IT IS SO ORDERED.**

/s/ Bruce Howe Hendricks
United States District Judge

February 10, 2015
Greenville, South Carolina